OPINION OF THE COURT
Jeffrey M. Atlas, J.
The individual petitioners are New York City residents who have established and developed community gardens in their lower east side and Harlem neighborhoods on land owned by the City of New York and left vacant by the demolition of small buildings, tenements and brownstones abandoned by their original owners. The New York City Coalition for the Preservation of Gardens is a collective of many such gardeners raising gardens on such lots throughout the City. Many of these gardens are set on lots licensed by the City to the gardeners until such time as they are reclaimed by the City for development. In many instances, gardens have been operated with the financial help of City government programs, such as operation Green Thumb, and many have served as community centers *647 and a point of pride for the communities that maintained them. Some of the gardens have been maintained primarily by neighborhood residents and exist on City-owned lots without the express consent or license of the City. This proceeding is occasioned by the fact that a particular City program now seeks to reclaim the garden lots for the needed development of low-cost housing.
Since 1982, the New York City Department of Housing Preservation and Development (HPD) has worked jointly with the New York City Housing Partnership (NYCHP), a not-for-profit housing sponsor, in maintaining the New Homes Program (NHP), a sponsor utilizing combinations of public aid to assist privately financed construction, on City-owned land, of affordable one, two and three family homes, condominiums and cooperatives for moderate and middle income purchasers. Since its inception, with NHP sponsorship, some 9,000 such units have been built and occupied throughout the City and many more are contemplated. NHP, established to function in perpetuity, does not appear to have a comprehensive detailed plan for each building project it hopes to sponsor in the distant future, nor does it imagine the building of all units to be erected by it as part of a single and interdependent building scheme. Indeed, at various intervals and project by project, when it has formally been decided to encourage the construction of such units at a particular location, HPD and NHP, by public advertisement, seek builders to submit their qualifications to build the units. This request for qualifications (RFQ) lists specific sites, generally located in all five boroughs of the City, then designated for development. To facilitate the development of these housing units, the City sells the properties in question to a subsidiary of the NYCHP and application is made to HPD and the City Council for approval of the contemplated construction under the State Environmental Quality Review Act (SEQRA; ECL art 8) and the New York City Charter and General Municipal Law land use provisions. When that approval is given, the Mayor’s approval of the disposition of the properties is then sought, and customarily obtained.
The petitioners now seek to enjoin the construction of condominium units sponsored by NHP and made the subject of a request for qualifications from interested builders issued on March 15, 1996. In general, petitioners complain that construction of such projects at the 27 sites enumerated in that RFQ would result in the destruction of hundreds of community gardens located at the numerous lots that make up each of *648 these sites. Petitioners urge me to enjoin the City from taking any further action to develop these sites, contending that approval of the projects would violate both the provisions of SEQRA and the General Municipal Law. Petitioners argue that all contemplated action should be stayed until appropriate environmental review is undertaken and land use laws complied with. In particular, petitioners seek to prevent imminent construction of an NHP project at various sites on the lower east side of Manhattan known as the “East 11th Street Partnership Project” (11th Street Project) and to prevent further action with respect to a proposed project in Harlem known as the “Central Harlem Project” (Harlem Project). Petitioners request an order annulling determinations made by HPD waiving review of both projects under the provisions of SEQRA, annulling the resolution of the City Council approving the 11th Street Project and waiving land use review of it under the City Charter and the General Municipal Law, and annulling the authorization given by the Mayor to transfer the lands in question to NYCHP pursuant to the determinations made by the other agencies in question. The evidence before me shows that of all the projects included in the RFQ in question, only 5 sites of the total 27 have been transferred by the City to the NYCHP and only 1, the 11th Street Project, has received complete City approval and is about to be constructed. The 11th Street Project is made up of nine sites all located within several blocks of each other on the lower east side of Manhattan. Two contiguous sites are on 13th Street and Avenue A, an additional site is on 11th Street near Avenue A, another on 11th Street at Avenue B, two others, not abutting, on 11th Street between Avenue B and Avenue C, and three others adjacent but wedged together in an odd pattern between 10th Street and 11th Street on Avenue C. Each site is generally made up of several adjacent lots. It should be noted that all NHP projects seem generally to be built on available sites that may be bound together in a given neighborhood in a manner that makes each project economically feasible. The Harlem Project, incorporating many lots at diverse locations as far south as 121st Street and as far north as 129th Street, is, of course, similar. It has only been the subject of HPD waiver of SEQRA review.
Petitioners complain that in May 1997, respondent HPD acted capriciously and in violation of the law when it determined, under the provisions of SEQRA, that both the Harlem and 11th Street Projects were Type II actions which required *649 none of the exhaustive environmental review required of all other building actions described as Type I or unlisted actions by SEQRA. Moreover, petitioners complain that the City Council violated the City Charter by unlawfully waiving the land use review provisions of the City Charter for these projects. Finally, petitioners complain that the Mayor’s action in approving these projects and authorizing transfer of land in complete reliance on the determinations made by the other City agencies is equally unlawful and should, as with the others, be set aside.
For their part, respondents seek dismissal of the petition and contend that the petitioners lack standing to make these complaints and that all the actions of the agencies involved were lawful and rational determinations based on appropriate considerations. In particular, respondents note that the statutory law involved specifically allows for exemptions from environmental and land use review provisions for projects of this very type and, they contend, such exemptions were appropriately granted for these projects.
I
Respondents urge that I first consider whether the petitioners have standing to complain of the City’s determinations enabling the construction of the projects at the lower east side and Harlem locations. Indeed, “[w]hether a person seeking relief is a proper party to request an adjudication is an aspect of justiciability which, when challenged, must be considered at the outset of any litigation (Matter of Dairylea Coop. v Walkley, 38 NY2d 6, 9).” (Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 769.)
Petitioners in this case have complained of infringement of their rights and interests as garden founders, owners and workers. The material submitted by petitioners in support of their position, whether by affidavits or additional evidence, concerns the extraordinary efforts made by community members and others to establish and maintain the gardens in question. This uncontradicted evidence also shows the continued need to maintain these gardens for the stability of the community and for its beneficial impact on the surrounding environment. The affidavits of the individual petitioners, all of whom are gardeners either at the 11th Street Project sites or at the Harlem Project sites, make clear that their immediate concern is the preservation of the gardens at those sites. Clearly, the injuries which they have demonstrated will be *650 brought about by the City’s continued action are the immediate loss of the gardens in question and the infringement upon their interest in preserving these community treasures for the future.[1] On the other hand, respondents have shown, without dispute, that the gardens at the Harlem Project sites exist subject to a license that was revocable by the City when it sought to recapture the sites for development. As for the 11th Street Project, there is no doubt that these sites were never licensed to the gardeners and, while maintained openly for many years, the gardens were never expressly permitted by the City to be maintained on its land.
In general, the law on standing permits an action seeking review of governmental determinations only when the rights of the party requesting relief are affected. Such party must establish the existence of an injury in fact—an actual legal stake in the matter being adjudicated—in order to ensure that the prosecuting party has some concrete interest capable of sound and enduring judicial resolution (Society of Plastics Indus. v County of Suffolk, supra, at .772-773). In addition, a claim of standing must survive other limitations such as the “general prohibition on one litigant raising the legal rights of another; a ban on adjudication of generalized grievances more appropriately addressed by the representative branches; and the requirement that the interest or injury asserted fall within the zone of interests protected by the statute invoked” (Society of Plastics Indus. v County of Suffolk, supra, at 773). Finally, another established principle in the law of standing holds that “[i]n land use matters especially” the petitioner, for standing purposes, “must show that it would suffer direct harm, injury that is in some way different” in kind or degree “from that of the public at large” (Society of Plastics Indus. v County of Suffolk, supra, at 774).
*651 However, even when a petitioner seeks to challenge an administrative decision to vindicate an identifiable interest of his own, such interest must be a “legally cognizable interest” (see, Matter of Sun-Brite Car Wash v Board of Zoning & Appeals, supra, at 412-413; Matter of Lee v New York City Dept. of Hous. Preservation & Dev., 212 AD2d 453 [1st Dept 1995]). Thus, where petitioners have no legal right to be present on property, that is, where they lack license, lease or other evidence of legal claim or right to use the property in question, they are without standing to challenge administrative decisions affecting that property. Clearly, without a license to property or with only a license revocable at will, one lacks a legally cognizable interest upon which to base standing to complain of decisions affecting the use of that property (see, Matter of Lee v New York City Dept. of Hous. Preservation & Dev., supra; P & A Bros. v City of N. Y. Dept. of Parks & Recreation, 184 AD2d 267 [1st Dept 1992]; D’Aversa v Guido, 213 App Div 355 [1st Dept 1925], affd 244 NY 590; Kaiser v Cinberg, 130 App Div 254 [2d Dept 1909]; Matter of Trustees of Vil. of White Plains, 124 App Div 1 [2d Dept 1908]) and, absent such a cognizable interest, such person’s claim of injury differs not at all from that of the public at large.
It follows that petitioners herein lack standing to challenge the land use determinations by which the gardens at the 11th Street Project and Harlem Project sites will be eliminated. Petitioners have absolutely no legally cognizable interest in the 11th Street Project sites since their use of those properties was never licensed by the City. The petitioners, of course, lack standing with respect to the Harlem Project sites since any licenses to use those properties, revocable at will by the City, have been revoked.
II
As all parties concede, my review of an agency’s SEQRA determination is limited to whether the determination was made in accordance with lawful procedure and whether, substantively, the determination was affected by an error of law or was arbitrary and capricious or an abuse of discretion (CPLR 7803 [3]; Akpan v Koch, 75 NY2d 561, 570; Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 363).
It has often been noted that the primary purpose of SEQRA is “ ‘to inject environmental considerations directly into governmental decision making’ ” and that, to that end, the statute mandates the preparation of an environmental impact *652 statement when a proposed action, such as construction or other activity, may have a significant effect on the environment (Akpan v Koch, supra, at 569; 6 NYCRR part 617 [SEQR]). However, SEQR also provides that actions designated by that law as Type II actions, such as construction of buildings, require neither determinations of significance nor environmental impact statements (6 NYCRR 617.3 [f]). While there may be many different kinds of Type II actions not subject to agency review under SEQR, at least one such action is the “replacement, rehabilitation or reconstruction of a structure or facility, in kind, on the same site * * * unless such action meets or exceeds any of the thresholds in section 617.4” of SEQR (6 NYCRR 617.5 [c] [2] [emphasis supplied]). To maintain its status as an exempt or Type II action, such a construction project in a city or town having a population greater than 1,000,000 may not meet or exceed the threshold of “2,500 units to be connected (at the commencement of habitation) to existing community or public water and sewerage systems including sewage treatment works” (6 NYCRR 617.4 [b] [5] [v]).
Respondents contend that the projects at stake here, all separate and distinct in concept, geography, neighborhood, construction and operation, are exempt actions under SEQRA and that, to the extent that HPD has deemed any such project exempt from SEQRA review as a Type II project, such a determination reflects a complete and rational consideration of all available facts and a correct application by the City of the relevant law. In short, respondents urge me to accept that the 11th Street Project is simply a construction project to replace, in kind, buildings that had existed at the very same sites and that such an action is indeed exempt from SEQR review. Respondents also contend that the same is true of the Harlem Project and all other NHP projects that seek to replace homes on lots throughout the City that once were occupied by similar housing.
There seems little doubt that the 11th Street Project, for example, involves the construction of several row houses on each site, each no more than four stories in height, each house separated completely from the other adjacent houses and each containing no more than three to four living units or apartments. There is no dispute that these same lots, zoned for seven-story dwellings and commercial space, not very long ago contained low-rise tenements housing several apartments in each building. The conclusion is inescapable that the action *653 contemplated at the 11th Street Project is the construction of buildings at the same site as replacements, in kind, of the buildings that once existed at that very site.
Petitioners argue, however, that the contemplated action at these sites does not constitute replacement of buildings “in kind” since these lots have, in some measure, been occupied for more than five years, and in some instances for 10 years, by community gardens. Petitioners’ claim rests on the notion that these lots are no longer vacant but are occupied by established gardens, and that the intervening change in the character and history of the sites, which once contained residential buildings, prevents the determination that the contemplated action constitutes replacement of structures in kind. Petitioners contend that, given the new character of the lots, the proposed actions present serious environmental consequences requiring review under SEQR.
But, as the regulation makes clear, the determination that a project is exempt from review as Type II has little to do with what petitioners, or even the court, may perceive is the environmental impact of such action. Rather, actions enumerated in subdivision (c) of 6 NYCRR 617.5 are “not subject to review” under SEQRA because these actions have been determined “not to have a significant impact on the environment” (6 NYCRR 617.5 [a]). As for petitioners’ argument that the recent, albeit temporary, use of the site as a garden somehow prevents this project from being viewed as a reconstruction of a structure, in kind, on the same site, that notion finds no support in case law and is plainly an attempt, not to interpret the regulation, but to amend it to accommodate petitioners’ particular dilemma. To begin with, petitioners’ claim that the lots are not now vacant is of no moment, notwithstanding the finding by HPD accompanying its Type II determination that the lots in question are currently vacant.[2] In fact, according to the regulation, the Type II determination may be based exclusively upon an assessment of the type of construction contemplated and whether that construction exceeds certain thresholds described in SEQR. The regulation says nothing about the condition of the lots in question at the time of proposed development, and does not explicitly require that they be filled with housing at the time of the determination or that they be vacant at that time. Moreover, the words “replacement, rehabilitation or reconstruction” cannot be read *654 to suggest that the sites in question must have existing structures on them at the time of the project (see, Manhattan Val. Neighbors for Permanent Hous. for Homeless v Koch, 168 AD2d 262 [1st Dept 1990]; Rivera v H.P.D., Sup Ct, NY County, Dec. 8, 1993, index No. 10483/90; Fishman v New York City School Constr. Auth., NYLJ, June 8, 1990, at 27, col 3 [Sup Ct, Kings County]). Indeed, a rational and commonsense approach to the law suggests that it should be read to apply to lots, which, of necessity and for reasons of safety, health or esthetics, have already been cleared, as well as to those currently occupied by buildings. Finally, nothing in the regulation speaks of the effect of intervening use or of any natural changes that might take place at the proposed site during the period it is without buildings. Indeed, sites left vacant during the period of time it usually takes to assemble and finance a construction project normally can be expected to change appearance and character. Plainly, because the exemption is designed to meet the practical necessities and exigencies of maintaining an evolving and modern community, it simply exempts in kind replacement of buildings irrespective of any intervening change in the character of the sites involved. Indeed, the instant case makes evident the rationality of that approach, which permits intervening and temporary use of vacant lots for the public good subject to the revocation of that use when the sites are, after the long and difficult preparation period, finally ready for replacement construction. To interpret the regulation differently is to run the risk of discouraging the granting of such temporary licenses in the future and contributing, thereby, to the continued blight in many City areas. Finally, it must be noted that the current use of some of these sites as gardens does not serve to revise the history of these properties which, until relatively recently, were used for residential purposes. The use of the sites, under temporary grants from the City and, in the case of the 11th Street Project sites, without the grant of any license from the City at all, does not require HPD, the City or the court to pretend that the sites were never residential ones or that they might never again become residential by the replacement of demolished abandoned buildings.
Petitioners also argue that the Type II determination was inappropriate and a violation of the law because it was made possible by the inappropriate segmentation of a much larger development into smaller parts in order to avoid the requirements of SEQRA. In this respect, petitioners contend that the *655 NHP, having sponsored the building of 9,000 units of residential space over the past 15 years, contemplates the City-wide construction of several thousand more units over the next few years. Thus, petitioners conclude that the 11th Street Project, the Harlem Project and other projects for which an RFQ was published in 1996 constitute part of an enormous development being undertaken by the City. Petitioners contend that treatment of the 11th Street Project, for example, as a separate and independent action, without regard for its environmental impact when treated in combination with the remainder of all construction by the NHP, violates the spirit and letter of SEQR. Petitioners’ position again ignores the exemption made clear in 6 NYCRR 617.5 (c) (2) and 617.4 (b) (5) (v). It is of course true that, in considering the environmental impact of Type I and unlisted actions defined in SEQR, the agency responsible cannot ignore the combined impact of a development with closely related and multiple phases, nor can it countenance the deliberate division of such developments into smaller parts in an attempt to circumvent the rules of SEQR (see, Matter of Village of Westbury v Department of Transp., 75 NY2d 62; Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, supra; Matter of Karasz v Wallace, 134 Misc 2d 1052 [Sup Ct, Saratoga County 1987]). However, that rule seems to apply only to non-Type II actions. No part or parts of the regulation defining Type II actions or governing determinations with respect to such actions in any way suggests that such a broad environmental impact review of similar projects must be undertaken to determine if a project is exempt from such review or to determine if an otherwise exempt action is subject to the loss of its exemption by such an analysis.
This is not to suggest that reconstruction of “in kind” structures is exempt from review without further limitation. In fact, SEQR also provides that the action is not exempt if it “meets or exceeds any of the thresholds in [6 NYCRR] 617.4” (6 NYCRR 617.5 [c] [2]). Petitioners, arguing that such thresholds are met and perhaps exceeded if one considers each NHP in combination with all other such projects and not as “standalone” actions, contend that HPD failed to make the “threshold” determination by considering the broader activities of the NYCHP and thereby acted arbitrarily, capriciously and in violation of the law.
Once again, petitioners’ argument, in an earnest desire to preserve the community gardens, goes beyond the express *656 requirements of the regulation. To begin with, section 617.5 (c) (2) exempts from review the action of replacement of a structure, in kind, on the same site. Clearly, this section pertains to construction on the very site where once there existed another building of the same or similar character to the one proposed for construction. The regulation neither grants nor denies exemptions for construction to be performed at other sites, nor does it, by its language, concern itself with projects at other sites, whether tightly or loosely related to the one in question. Thus, when determining if “such action meets or exceeds any of the thresholds in 617.4” of the regulations, one is compelled to inquire only if the replacement building at the site in question meets or exceeds those thresholds. In short, the phrase “such action” refers only to the replacement on one particular site of a building of the character that once existed there. The only threshold requirement in section 617.4 that is applicable here is found in subdivision (b) (5) (v) which requires that construction of new units at that site be not equal to nor exceed 2,500 units connected to existing community or public water and sewerage systems including sewage treatment works. Obviously, the threshold requirements were not exceeded in this case. Short of referring to cases which speak against the segmenting of non-Type II projects, petitioners can point to no cases or statutory law which otherwise require the kind of combined review they suggest in determining the exemption of these projects from review.
Finally, it should also be noted that an analysis which requires the consideration of all projects whether planned, envisioned or merely hoped for, is simply an unrealistic requirement. As the respondents have pointed out, the mere fact that these projects have a common sponsor to enable the financing of such projects, or even the fact that they are based on a common general idea for the future of the City, does not so tie together the otherwise totally disparate projects which are separately financed, built individually by separate builders at separate times, located in totally different parts of the City and in no way dependent upon each other, as to require them to be considered one development for threshold determinations or environmental review (see, Matter of Long Is. Pine Barrens Socy. v Planning Bd., 80 NY2d 500; Matter of Schodack Concerned Citizens v Town Bd., 142 Misc 2d 590, affd 148 AD2d 130 [3d Dept], lv denied 75 NY2d 701).
*657 III
Petitioners also contend that the City, in particular the City Council, violated the law by waiving land use review of the 11th Street Project otherwise required by the City Charter. Petitioners point to chapter 8, sections 197-c and 197-d of the New York City Charter which require that proposed housing projects classified as urban development action area projects and the contemplated disposition of property by the City be scrutinized pursuant to uniform land use review procedure before being undertaken. While petitioners complain that no such review was conducted here, respondents note that the City Council waived such review for the 11th Street Project in accordance with the Urban Development Action Area Act (General Municipal Law art 16) which provides that designation of an urban development action area and consequent land use review of a project within that designation (pursuant to City Charter §§ 197-c, 197-d) may be waived “if a proposed urban development action area project is to be developed on municipally-owned land and consists solely of the rehabilitation or conservation of existing private or multiple dwellings or the construction of one to four unit dwellings without any change in land use permitted by local zoning” (General Municipal Law § 693 [emphasis supplied]). Petitioners respond by complaining that the proposed houses at the 11th Street Project sites do not consist solely of one- to four-unit dwellings. First, petitioners contend, all of the 98 units proposed to be built at those combined sites must be considered as if they were one large project rather than smaller buildings segmented to get around the requirements of the General Municipal Law. Beyond that, petitioners argue, these projects do not consist solely of one- to four-unit dwellings because they include the construction of some commercial space attached to the dwellings.
Petitioners’ claims regarding improper segmentation of the project are not supported by the record. All the evidence before me with respect to the proposed project shows the 11th Street Project enterprise to consist of multiple and separate row houses, no one of which exceeds four stories and all of which contain no more than four separate apartments or dwelling units. The plans for these units show that there are nine sites in the project, each site separated from the others and, within each site, several separate row houses. While for economic reasons, units at various sites share some sewage and heating facilities, the buildings are otherwise independent, *658 separated by fire and bearing walls, each with its own entrance, none connected by common halls and each expected to be autonomous in its operation as a condominium. Whatever may be said about their commonality, as for example that they share some facilities, or that they will be built by the same contractor, or that they are all sponsored by NHP, clearly, under these circumstances, the decision to treat these units as separate “one to four unit dwellings” is a rational one. Certainly it cannot be said that, in such matters, any single factor is dispositive. The determination as to whether such a project qualifies for the waiver in question must rest on the assessment of many factors contributing to the character of such a project, as well as upon the assessing agency’s need to improve the community and to carry out the purposes of the statute. Thus, common sewage or heating may be but one or two factors, among many, to be considered by the governing body and compared with other factors evidencing the separate character of each row house. In that respect, it should be noted that the urban renewal provisions contained in the General Municipal Law encourage the creation of numerous multiple dwellings at the same time in a designated area. Moreover, the same law, in fostering construction of these projects by certain kinds of contractors, encourages such contractors, for obvious economic reasons, to build many houses at the same time. By the same token, the purposes of this law certainly are fulfilled by allowing sponsorship to come from one source capable of coordinating the financing necessary to enable this kind of construction (General Municipal Law §§ 690, 691). Thus, denying such a project the exemption contained in the General Municipal Law by treating the creation of multiple row houses as one large and connected dwelling could certainly be said to be inconsistent with the very purpose of this law which was intended to serve as a mechanism to accelerate improvements of municipally owned areas and to hasten the disposition of properties in such areas (Mem of Legislative Representative of City of NY in support of L 1982, ch 486, 1982 McKinney’s Session Laws of NY, at 2499). Petitioners urge me to accept that the respondents have deliberately treated these units as separate to get around the constraints of the law and avoid land use review. There is no evidence of that and such a conclusion would be no more justified than one which posits that petitioners seek to treat all the projects collectively simply to include the project within the land use review laws and thereby stop construction. The issue is resolved by acknowledging that, upon weighing all *659 relevant factors, the City Council’s decision in this regard is rational and not arbitrary, capricious or a violation of the law.
Finally, petitioners contend that the City Council’s decision to waive land use review violates the provisions of General Municipal Law § 693 by permitting, without such review, the construction of ground floor commercial space in conjunction with one- to four-unit dwellings. Petitioners refer to the fact that the 11th Street Project contemplates the construction of a total of 12,800 square feet of commercial space to be located at the ground floor level of three row house sites. In fact, architectural plans of the 11th Street Project show that, amongst the total of 98 condominium units to be built in 22 row houses, three stores will be built—one of 4,900 square feet at 13th Street and Avenue A, one of 5,600 square feet at 11th Street and Avenue B and one of 2,300 square feet at 11th Street and Avenue C. The construction of this commercial space, they insist, means that this project does not consist solely of the construction of one- to four-unit dwellings. Respondents, on the other hand, argue that the word “dwellings” refers either to buildings that consist exclusively of homes or to buildings that consist primarily of homes along with some incidental commercial space.
Because the General Municipal Law does not define the word “dwellings”, respondents urge me to accept the definition of that term as it is used in other statutes. For example, section 4 (4) of the Multiple Dwelling Law defines a dwelling as “any building or structure or portion thereof which is occupied in whole or in part as the home, residence or sleeping place of one or more human beings.” The Public Health Law defines a “dwelling” as a “building or structure or portion thereof, including the property occupied by and appurtenant to such dwelling, which is occupied in whole or in part as the home, residence or sleeping place of one or more human beings” (Public Health Law § 1370 [1]). The Penal Law defines “dwelling” as “a building which is usually occupied by a person lodging therein at night” (Penal Law § 140.00 [3]). However, these definitions cannot simply be imported into other statutes to supply the needed definition. At best, such statutory definitions serve only to suggest that the overriding purpose of much legislation is carried out by a broader, rather than narrower, definition of the word, and they provide convincing evidence that the Legislature might well, from time to time, define “dwelling” as including commercial space. Whether such a definition of the word is justified here, given the distinct purposes of this stat *660 ute, is another matter. One must first question whether “dwellings” as that term is used in the General Municipal Law was meant to include incidental commercial space, whether such an interpretation serves the purposes of the legislation and finally, what legislative purpose was served by including the qualifying word “solely” in the section (General Municipal Law § 693).
Section 693 is one of the provisions of the General Municipal Law and is part of the Urban Development Action Area Act. This Act was intended to remedy the deplorable, unhealthy and substandard conditions of urban areas in the State which had come about through abandonment, neglect and general deterioration of residential and commercial properties. Specifically, the Legislature recognized that, by reason of the extent of urban blight and the extraordinary complexity of the task of correcting such conditions, “prospective owners in such areas lack the incentive or means to properly maintain, improve or redevelop parcels” (Legislative Findings and Declaration of Purpose, reprinted in McKinney’s Cons Laws of NY, Book 23, General Municipal Law § 690, Historical Note, at 150), and such conditions discourage builders and investors from developing such areas. Thus, the Legislature’s declared purpose was to provide incentives for the proper redevelopment of such areas, to enlist participation by established entrepreneurs experienced in the development of low-rise residential structures meant to replace those generally found in such urban areas, and to stimulate private investment and redevelopment to prevent the spread of slums and blight. (Legislative Findings and Declaration of Purpose, id., at 149; General Municipal Law § 691.) In pursuing this goal, the Legislature provided that local governing bodies might designate certain locations as urban action development areas. These areas, it was planned, would be redeveloped after review of the projects under local land use laws. In some instances, however, designation of an area as an urban development action area was deemed unnecessary and redevelopment of such areas was permitted without scrutiny under local laws, and, therefore, without the delay usually attending such review. Thus, section 693 was passed permitting waiver of the area designation requirement where “only the ‘as-is’ use of a municipally-owned property is proposed.” (Mem of Legislative Representative of City of NY in support of L 1982, ch 486, 1982 McKinney’s Session Laws of NY, at 2499.) What was intended by section 693, then, was that waiver of cumbersome review would be permitted in order to facilitate *661 the rehabilitation of salvageable existing private or multiple dwellings and the replacement, in kind, of structures that were lost, abandoned or destroyed. The history and purpose of the law suggests, then, that this section was meant to facilitate replacement of housing on an as-is basis and in accordance with existing zoning regulations so as to restore a neighborhood as quickly and economically as possible to its original character. Thus replacement of low-rise housing, even containing some incidental and supportive ground floor commercial space, falls well within the scope of thin legislative plan for it is surely beyond dispute that, in an extraordinary number of instances in most urban areas, the original buildings being replaced are of that very same character. Beyond that, it is hard to imagine that the Legislature would have contemplated the replacement or redevelopment of so much housing without allowing for some incidental commercial space to support the needs of residents and to help make the development projects economically feasible. Indeed, to require a project of the kind contemplated by this provision to be submitted to time-consuming local review, simply because of the incidental inclusion of one or two or even three ordinary stores, is to defeat the very purpose of the waiver provided for in the section.
Finally, assuming that this legislation allows for the prompt construction of residential buildings with some incidental commercial space, one must still be concerned with the meaning of the qualifying word “solely” when applied to the phrase “the construction of one to four unit dwellings”. Again, legislative history strongly suggests that the phrase was meant to assure that waivers of review and speedy development without land use scrutiny would be confined to “as-is” construction and would not exempt high-rise buildings, immense housing complexes, shopping centers and major developments of a dimension far beyond that which previously characterized deteriorating urban neighborhoods. The word “solely” is to be read to qualify the size and dimension of the project in question, not to prohibit the attachment of incidental commercial space customarily found in ground floor storefronts that support the residents of countless neighborhoods throughout the State.
In view of the fact that the construction contemplated here will contain only incidental ground floor store space, taking up no more than a fraction of the entire project, and in view of the fact that local zoning laws permit the construction of residential buildings and commercial space of such a character, the *662 determination by the City Council which was approved by the Mayor is lawful and certainly not arbitrary or capricious in any respect.
Finally, I should note petitioners’ request that I enjoin all further action that might be taken by the City’s agencies to develop other sites for which an RFQ was published. Obviously, beyond the RFQ, no action has been taken at all by the City as to these sites and, therefore, no determination exists for review under CPLR article 78. There is no reason for the court to enjoin behavior which may well be performed lawfully and with sound reason.
The motions of the respondents are granted and the petition is dismissed.

. Well after the petition was brought and responded to, the court offered the parties an opportunity to submit memoranda of law further examining the standing issue raised by respondents in each of its responses. Petitioners’ reply was to seek to amend their petition and supply additional affidavits in an apparent attempt to provide standing as “a nearby owner” presumably able to challenge a determination without proof of actual injury (see, Matter of Sun-Brite Car Wash v Board of Zoning & Appeals, 69 NY2d 406). As to these submissions seeking to alter the course obviously taken by petitioners from the beginning, I note that petitioners’ papers still complain, primarily, about the individual petitioners’ loss of the gardens, and are unconvincing and disingenuous in their attempt to establish any harm to petitioners different from that suffered by the public generally (see, Matter of Sun-Brite Car Wash v Board of Zoning & Appeals, supra, at 414).

. Respondents argue that the term “vacant”, as used by HPD, simply means “without buildings”.