OPINION OF THE COURT
James G. Starkey, J.
Petitioners, political representatives of various districts and boroughs in the City of New York, moved by order to show cause, seeking to vacate respondents’ determination — because of severe fiscal constraints — to close eight firehouses, dissolve eight fire companies and relocate an additional unit.[1] Petitioners alleged that the required notices of closing were inadequate and not sent to some proper parties; that respondents’ determination was arbitrary and capricious; and that the decision to close the firehouses violated the New York State Environmental Quality Review Act (SEQRA), and New York City’s Environmental Quality Review (CEQR) regulations. Respondents urged that the notices were adequate and properly served, that the planned actions had a rational basis, were neither arbitrary nor capricious and not in violation of state or city environmental quality review provisions.
Prior Proceedings
When the parties made their arguments on May 20, 2003, the respondents stated their intention to proceed with the planned closings without delay. The court expressed concern that insufficient notice might have been given as to Engine Company 261 and recommended to respondents’ counsel that the apparent defect be remedied and the unit not be closed for the next 45 days in compliance with the notice requirements of section 487 (a) of the New York City Charter. Respondents declined and— *560 when petitioners orally requested a preliminary injunction— argued, inter alia, that petitioners could not show that irreparable harm would result if the closings went forward because the units could be reconstituted and returned as easily as they could be disbanded. The closings of the units — except for the two exempted under the revised plan — occurred days later.
On June 30, 2003 an interim decision and order was entered ruling that petitioners had not established that the decision to close the firehouses was arbitrary and capricious, or that respondents had failed to comply with SEQRA or CEQR, or that the notices failed to describe adequately the bases for the decisions. The decision also ruled that all requisite parties had been given proper notice with the exception of Community Board 8 and the relevant member of the City Council concerning the closing of Engine Company 261, insofar as that engine company (located in Queens County) served Roosevelt Island. The decision also ruled that, as to the closing of that engine company, respondents had failed to comply with the notice requirements of section 487 (a) of the New York City Charter and that the closing of Engine Company 261 occurred in violation of that provision of law. A detailed discussion of the evidence and the applicable legal principles was deferred and further argument was directed concerning the relief to which petitioners were entitled. Argument concerning that issue was made by the parties on August 14, 2003.
The Facts
Over the last two years, the New York City Fire Department and other city agencies have been directed to reduce their budgets to help the City cope with severe budgetary constraints. In the fiscal year 2003, the Fire Department’s budget was reduced by 2.5%. Then, in January 2003, the City’s budget office projected a $2.9 billion budget gap for fiscal year 2004, and city agencies as a group were directed to create an additional $600 million in savings. The Fire Department’s share of the burden involved a direction to reduce its budget by an additional $23.5 million.
The directive compelled deep cuts in all aspects of the department’s functions. The department’s senior officers analyzed the City’s fire suppression needs and the department’s ability to address those needs safely and adequately. They then reviewed their findings and the bases for their findings, as well as budget redirection proposals and alternative solutions. In the *561 end, it was determined that eight fire companies could be dissolved and their houses closed and two units relocated without jeopardizing public safety and with the least impact on fire protection in the surrounding areas and the City as a whole. It was estimated that the closings would result in savings of approximately $10.8 million.
The Companies Designated
There are 203 Engine Companies, 143 Ladder Companies, and approximately 13 Squad, Rescue and Hazardous Material (Hazmat) Companies in the Fire Department. The companies to be closed included seven engine companies and one squad unit. (A “squad” is an engine company whose crew can perform other specialized duties including, in this case, hazardous materials response.) The companies designated included:
• Engine Company 204, 299 Degraw Street, in the Cobble Hill section of Brooklyn;
• Engine Company 212, 136 Wythe Avenue, in the Greenpoint section of Brooklyn;
• Squad Company 252, 617 Central Avenue, in the Bushwick section of Brooklyn, was to be relocated to the quarters of Engine Company 44, 221 East 75th Street in the Upper East Side section of Manhattan; and the members of Engine Company 44 were to be reassigned to other units. The plan was revised after argument to leave both units in place thereby mooting the application as to those units and the Bushwick firehouse.
• Engine Company 278, 5011 7th Avenue, in the Sunset Park section of Brooklyn;
• Engine Company 36, 120 E. 125th Street in the East Harlem section of Manhattan;
• Engine Company 209, 850 Bedford Avenue, in the Williamsburg/Bedford-Stuyvesant section of Brooklyn;
• Engine Company 261, 37-20 29th Street, in Long Island City, Queens; and
• Engine Company 293, 89-40 8th Street, in Woodhaven, Queens. The plan was also revised after argument to leave this unit in place thereby mooting the application as to this unit and firehouse.
Analysis and Criteria
The analysis examined statistics and other data produced by a computerized siting model. Three primary statistical criteria *562 and three secondary statistical criteria were employed, as well as other factors. Preserving adequate response times was a significant factor in the analysis, so the analysis considered not only the activity of the fire company to be closed, but also the activity level of the nearby companies. Other factors taken into account, when appropriate, included proximity to other units, work load impact on surrounding units, street layout and geographic obstacles, and response of perimeter companies.
The three top criteria used were:
• Postclosing response time to the company’s first due alarm box assignments: the response time of the engine due to arrive first at the alarm boxes to which the closed engine company was formerly due to be the first to arrive. “Alarm boxes” designate the geographic areas to which a company responds.
• Occupied structure work: the number of fires in occupied structures worked by the company selected for closing.
• Response time to the company’s second due alarm box assignments: the response time of the engine due to arrive second at the alarm boxes to which the closed engine company was formerly due to arrive second.
Additional statistical criteria included:
• Total runs: total responses by the company, including runs that were not necessarily related to firefighting;
• Medical emergencies: total medical responses by the company; and
• Workers: runs where the company performed work at the location, although not necessarily fire related, such as the initial search of a building following a false alarm.
Aside from the statistical criteria described, the operational expertise of the department’s senior staff was also employed. While conceding that the closing of the six companies might affect services to some extent in the impacted communities, respondents expressed the belief that public safety would not be jeopardized.
The Affected Companies
Engine Company 204
Engine Company 204, located at 299 Degraw Street in the Cobble Hill section of Brooklyn, was one of eight engine companies in the area. In 2001, it responded to 614 total runs, which ranked 175th out of 203 engine companies. Of those runs, *563 112 were fires in occupied structures, which ranked 149th out of 203 companies. It responded to a first due alarm box assignment in an average 3 minutes, 27 seconds and to a second due alarm box in 4 minutes, 27 seconds. After closure, the first due response time was expected to be 4 minutes, 27 seconds, and second due response time 5 minutes, 0 seconds. The increase in response time then, after closure, was predicted to be 1 minute as to a first due and 33 seconds as to a second due assignment.
Engine Company 204 was statistically similar and geographically close to Engine Company 224, which is located at 274 Hicks Street, in Brooklyn Heights. The reason Engine Company 204 was chosen is that it was deemed necessary to preserve an appropriate response time to Brooklyn Heights. Engine Company 224 was retained because the Brooklyn Heights area includes many large buildings, including nonfireproof hotels with frequently difficult access because of the street layout and traffic congestion and the difficulty in maneuvering firefighting apparatus, even in normal traffic conditions.
On the other hand, Engine Company 204 was located in a residential area of mostly three- and four-story buildings, and that community is easier to cover because it is surrounded by several other companies including Engine Companies 202, 205, 220, 224, 226, 239 and 279. Engine Company 224 is also closer to the piers and has better access to the Brooklyn-Queens Expressway. Therefore, Engine Company 204 was deemed a suitable company that could be closed with minimal impact on the community, which would remain with seven other engine companies nearby.
Engine Company 212
Engine Company 212 was located at 136 Wythe Avenue, in the Greenpoint section of Brooklyn, and responded to fewer incidents than most engine companies. In 2001, it responded to 1,085 total runs, which ranked 199th of 203 engine companies, of which 57 were fires in occupied structures, which ranked 192nd of 203 companies. It responded to a first due alarm box in 3 minutes, 9 seconds and to a second due alarm box in 4 minutes, 21 seconds. After closure, the first due response time was expected to be 4 minutes, 21 seconds and second due response time 4 minutes, 56 seconds. The increase in response time then, after closure, was predicted to be 1 minute, 12 seconds as to a first due, and 35 seconds as to a second due, assignment.
*564 There are four nearby engine companies (numbers 221, 229, 238 and 206), all of which had a relatively low work load and were available to cover the area. The neighborhood is residential with mostly three- and four-story buildings and there are no significant traffic obstacles to impede the response of surrounding companies.
Squad 252
As noted above, Squad 252 at 617 Central Avenue in the Bush-wick section of Brooklyn, formerly scheduled for relocation to the quarters of Engine Company 44 in Midtown Manhattan, will remain in place, as will Engine Company 44.
Engine Company 278
Engine Company 278 was located at 5011 7th Avenue in the Sunset Park section of Brooklyn. In 2001, it responded to 2,680 total runs, which ranked 95th out of 203 companies and 161 runs were fires in occupied structures, which ranked 113th of 203 companies. It responded to a first due alarm box assignment in 3 minutes, 48 seconds, and to a second due alarm box in 4 minutes, 40 seconds. After closure, the first due response time was expected to be 4 minutes, 40 seconds and second due response time 5 minutes, 17 seconds. The increase in response time, then, after closure, was predicted to be 52 seconds as to a first due and 37 seconds as to a second due assignment.
There are three nearby engine companies, numbers 201, 241 and 282. Though Engine Company 201 is in close proximity, it was concluded that it should not be closed because that company responds west (away from other companies and toward the harbor), is the first due company to the local hospital, Lutheran Medical Center, and is located on Fourth Avenue, a wider response route. It was therefore determined that neighboring companies could adequately cover the area and that Engine Company 278 could be safely closed.
Engine Company 36
Engine Company 36 was a single enginehouse located at 120 E. 125th Street, in the East Harlem section of Manhattan. In 2001, it responded to 2,845 runs, which ranked 88th of the 203 engine companies, and 172 of those runs were to fires in occupied structures, which ranked 5th in the City. It typically responded to a first due alarm box in 4 minutes, 4 seconds, and to a second due alarm box in 4 minutes, 37 seconds. After clos *565 ing, the first due response time was expected to be 4 minutes, 37 seconds and second due response time 5 minutes. The increase in response time then, after closure, was predicted to be 33 seconds to a first due and 23 seconds to a second due assignment.
There are four nearby engine companies, numbers 35, 58, 59 and 91. Engine Company 35 was located very close to Engine Company 36, but Engine Company 36 was selected for closure, rather than 35 because Engine Company 35 could respond to the first due alarm boxes of Engine Company 36 considerably faster than the converse (i.e., 4 minutes, 37 seconds by Engine Company 35 to the boxes of Engine 36, as opposed to 5 minutes, 5 seconds by Engine Company 36 to the boxes of Engine Company 35).
Engine Company 209
Engine Company 209 was located at 850 Bedford Avenue, in the Williamsburg/Bedford-Stuyvesant section of Brooklyn. In 2001, it responded to 2,141 total runs, which ranked 140th of the 203 engine companies, and 287 were fires in occupied structures, which ranked 39th in the City. It responded to a first due alarm box in 3 minutes, 29 seconds, and to a second due alarm box in 4 minutes, 28 seconds. After closing, a nearby engine company was expected to respond to the first due alarm in 4 minutes, 28 seconds and the second due alarm in 5 minutes, 0 seconds. The increase in response time then, after closure, was predicted to be 59 seconds as to a first due and 32 seconds as to a second due assignment.
There are five nearby engine companies (numbers 210, 230, 219, 211 and 235) which, it was concluded, would be able to absorb the work.
Engine Company 261
Engine Company 261 was in a double house located at 37-20 29th Street, in the Long Island City section of Queens. In 2001, it responded to 2,135 total runs, which ranked 135th out of 203 engine companies, of which 133 were fires in occupied structures, which also ranked 135th. It responded to a first due alarm box in 4 minutes, 8 seconds, and to a second due alarm box in 5 minutes, 10 seconds. After closure, the first due response time was expected to be 5 minutes, 10 seconds and the second due response time 5 minutes, 47 seconds. The increase in response time then, after closure, was expected to be 58 seconds as to a first due and 37 seconds as to a second due assignment.
*566 There are three nearby engine companies (numbers 258, 260 and 262). In Community District 1, where Engine 261 was located, the number of fires significantly declined from fiscal year 2001 to fiscal year 2002. Specifically, the number of fires in occupied structures decreased from 452 to 406, and the number of other fires from 638 to 562.
Engine Company 293
As noted above, Engine Company 293 located at 89-40 87th Street, in the Woodhaven section of Queens, formerly scheduled to be closed, will remain open.
The Mayoral Commission
In or about February 2003, the Mayor and the City Council Speaker agreed to establish a commission to examine the department’s criteria for closure of five companies and any possible alternative cuts. The commission comprised seven members: three from the fire department, two appointed by the Mayor, and two appointed by the Speaker.
The commission reviewed the criteria utilized by the department in selecting the companies chosen for closure, examined the relevant data attendant to their selection, and analyzed proposed closings. It also reviewed alternative savings and revenue proposals, including those proposed by the Speaker and his representatives on the commission. Ultimately, the commission voted five to two that no changes should be made to the proposed closings that had been previously specified.
The Notices of Closing
On April 7, 2003, acting to comply with section 487 (a) of the City Charter,[2] the Fire Commissioner sent notices of closing to community boards, City Council members and borough presidents in areas affected by the closings. The letters advised the recipients of the department’s plans and provided basic information as to the reason for the actions, as well as its plan to continue providing fire protection services to the affected areas. The Fire Commissioner also invited the recipients to contact *567 the department with follow-up questions or seek any other information they might need. After the notices were sent, fire department representatives responded to numerous inquiries from community boards, borough presidents, and other community and political leaders. In addition, on May 5, 2003, the Fire Commissioner testified at length at the City Council about the reductions and explained in greater detail how the department had made its decisions.
Though Community Board 8 did not receive notice of the planned closing of Engine Company 261 as prescribed by section 487 (a) of the City Charter, the board was aware that the closing was contemplated. By letter dated November 27, 2002 to the Mayor (copy to all City Council members) the chairman reported that on November 20, 2002 the board had passed resolutions “strenuously” opposing the closing of Engine Company 44 and “the closing of Engine 261 located in Long Island City, Queens, which is the only New York City Fire Department presence for Roosevelt Island.”
The Law
1. Claim that the State Environmental Quality Review Act and City Environmental Quality Review preclude the planned closings absent an environmental assessment or environmental impact statement.
The State Environmental Quality Review Act requires, inter alia, local agencies to consider environmental factors in any planning, review and decision making. (See ECL art 8.) Implementing regulations are found in 6 NYCRR part 617. The City Environmental Quality Review Act (62 RCNY ch 5) spells out the process by which City agencies are required to conduct an environmental review of proposed discretionary actions. The City Environmental Quality Review does not require review when it would not otherwise be required under SEQRA. (See 62 RCNY 5-02 [d].)
By statute, an environmental impact statement is required only when contemplated activities “may have a significant effect on the environment.” (See ECL 8-0109 [2].) To implement the law, the Commissioner of Environmental Conservation was directed to prepare a model assessment form for use during the initial review and to adopt rules and regulations specifying actions or classes of actions determined not to have a significant effect on the environment, as well as ones likely to require preparation of an environmental impact statement. (See ECL 8-0113 [2] [b], [l])
*568 In accordance with that direction, the activities predetermined to have no significant effect on the environment are set forth in 6 NYCRR 617.5. They are referred to as “Type II” actions and need not be preceded by the preparation of an environmental impact statement or any environmental assessment procedure. (See Matter of Civic Assn, of Utopia Estates v City of New York, 258 AD2d 650, 651 [2d Dept 1999] [concerning a Type II action, agency had “no further responsibilities under SEQRA”]; Matter of New York City Coalition for Preserv. of Gardens v Giuliani, 175 Misc 2d 644, 652 [Sup Ct, NY County 1997], affd 246 AD2d 399 [1st Dept 1998] [“Type II actions . . . require neither determinations of significance nor environmental impact statements . . .”]; Matter of Hazan v Howe, 214 AD2d 797, 798 [3d Dept 1995] [“No individualized assessment is required with respect to type II activities”].)
Included among the Type II actions that need no advance environmental assessment are “routine or continuing agency administration and management, not including new programs or major reordering of priorities that may affect the environment.” (6 NYCRR 617.5 [c] [20].)
Petitioners urge that the closing of the six units in question constitutes a “new program or major reordering of priorities that may affect the environment” and not “routine or continuing agency administration and management.” The precedents, however, are inconsistent with petitioner’s position. It has been repeatedly held that SEQRA and CEQR are inapplicable to the closing of a firehouse. (See Boyland v Koch, Sup Ct, NY County, June 20, 1988, Index No. 4960-88, affd on op below 154 AD2d 283 [1st Dept 1989]; Mancuso v Koch, Sup Ct, NY County, Jan. 31, 1989, Lebedeff, J., Index No. 23385-88; Davis v City of New York, Sup Ct, Bronx County, June 17, 1986, Silbowitz, J., Index No. 13899-86.) Nor does the fact that six units instead of one are to be terminated alter the equation in a substantial way.
The Fire Department has 203 engine companies, 143 ladder companies and at least a dozen specialized units. It is not disputed that the Fire Department routinely analyzes its deployment practices to ensure that its resources are allocated so as to accommodate changing fire protection needs throughout the City, consistent with fiscal constraints. The termination and redeployment of 6 units out of more than 355 could hardly be termed a “new program” or a “major reordering of priorities.”
Finally, it is undisputed that the noticed closures are the direct result of a radical downturn in the economy of New York *569 City and the fiscal crisis that ensued. It is also clear that the preparation of environmental impact statements is a complicated, burdensome process which takes many months to accomplish. (See ECL 8-0109 [2].) It is inconceivable that it was the intent of the Legislature to require such a time consuming process in the face of a fiscal crisis, thereby delaying the economic benefits and efficiencies to be achieved, deepening the crisis, and inviting more radical reductions down the line.
2. Claim that closure decisions were arbitrary and capricious.
Petitioners contend that the six closures affect units in Brooklyn, Queens and Manhattan and that — as reflected in the documentation included in the closing notices issued on April 7, 2003 — the analyses relied upon failed to take into account the interdependent nature of all units of the Fire Department. As a result, it is urged, the conclusion that the closures will have a negligible impact on public safety, health and welfare is unwarranted and the decisions to close the six units arbitrary and capricious.
As noted above, the decisions to close the six fire companies were the result of careful consideration by the Fire Commissioner in light of the current fiscal crisis and the detailed analyses of the senior members of his staff. From the relatively small number of closures and the analyses showing, inter alia, that response times will not be significantly reduced, it is clear that the closure decisions were made with a sound basis in reason and with regard to all of the surrounding facts. It cannot be said, therefore, that the decisions were arbitrary and capricious. (See Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974].)
Further, the noticed closures are the product of managerial and executive branch decisions which are not properly subject to judicial analysis in light of the established principle that the pattern of government in the State of New York includes the separation of the executive, legislative and judicial powers, and requires that each branch of government be free from interference in the lawful discharge of duties by other branches. (See Matter of New York State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v Cuomo, 64 NY2d 233, 238-240 [1984]; Mancuso v Koch, 156 AD2d 209 [1st Dept 1989].)
*570 3. Claim that the notices issued by the Fire Commission failed to comply with , section 487 (a) of the New York City Charter as to content and delivery.
In the first instance, petitioners urge that the information included in the notices was insufficient in that it was not complete and detailed enough to qualify as the “supporting documentation” required by section 487 (a) of the New York City Charter.
What constitutes sufficient “supporting documentation” was considered in Ensley v Dinkens (NYLJ, May 16, 1991, at 24, col 6 [Sup Ct, NY County, Wilk, J.]). After scrutiny of the legislative history, the court there properly concluded that the legislative purpose was simply to provide information that was sufficiently detailed so as to allow participation by the community in discussions concerning the ultimate decision.
“The notice as provided was not intended to be the sole source of information to the community as to the justification, or lack thereof, for the Fire Department’s decision. It was intended as the first step to create the occasion for further inquiry, and an opportunity to be heard, for members of the public concerned about any potential threat to public safety that might ensue.” (Id.)
Here, as in the Ensley case, the City Council held a hearing during which lengthy testimony was given by the Fire Commissioner. Here, as in that case, petitioners do not urge that any flaw in the notices prevented participation in, or subverted the effectiveness of, the hearing. Nor do they claim that the issues raised at the hearing were limited to the documentation in question so as to deprive petitioners of the chance to participate fully and effectively. Here, as in that case, it is concluded that the notices provided by the Fire Department accomplished the purpose intended by the Legislature and satisfied section 487 (a) with the information provided.
Concerning delivery of the notice, however (as previously noted in the interim decision and order of June 30, 2003), there was a failure of respondents to comply with section 487 (a) as to the planned closing of Engine Company 261. Specifically, though Engine Company 261 served Roosevelt Island, notice was not given either to Community Board 8 or the relevant member of the City Council.
Respondents urged that, though the statute requires notice to council members, community boards and borough presidents *571 “whose districts are served by such facility or unit,” notice to those parties was not necessary because Engine Company 261 did not primarily serve, and was only “second due” to arrive on, Roosevelt Island. Alternatively, respondents urged that notice was not necessary to those parties because they had “actual notice” of the planned closure of Engine Company 261 because of extensive media coverage mentioning that unit as one slated to be closed. They also note the November 20, 2002 resolution by Community Board 8, referred to above, opposing the closing of Engine Company 261.
On scrutiny however, each of these contentions lacks merit. Concerning the claim of “actual” notice, section 487 (a) — as noted in footnote 2 (supra) — requires that “the commissioner shall provide written notice with supporting documentation . . .” (emphasis added). The actual notice relied upon was, of course, plainly not the written notice directed by the statute. But more important, the publicity relied upon could hardly be said to constitute the supporting documentation specifically required.
As to the argument that the legislation was not intended to require notice as to “second due” units, section 487 (a) uses the term “served” and makes no distinction between service by primary or second due units. Further, the legislative history of section 487 (a) makes clearer yet that the Legislature intended to require notification as to both primary and “second due” units. For example, on March 4, 1988 the Fire Commissioner at the time (now a justice of this court) testified concerning the proposed legislation which became section 487 (a) before the Public Safety Committee of the New York City Council and proposed that the word “primarily” be added before the word “served,” so that the bill in its final form would require notice only to officials whose districts were “primarily served” by a firehouse or unit threatened with termination. (See legislative testimony of Public Safety Comm, Mar. 4,1988, at 12, lines 18-23.)
Later the following exchange took place between the chairperson and the Fire Commissioner.
“Chairperson: Commissioner, going back to the bill itself, in your suggestion to at least 30 days notice to permanent closing, going down to every Council Member, Borough President, whose district, could you tell me why you like the word ‘primary/ because personally I’m not in favor of that suggestion. My district, of course, has many — all of our colleagues, *572 of course, overlap in many areas.
“fire commissioner: You are suggesting it would be any district that is affected by it. I don’t think it was our intention to change that. Anybody who would have a district that was affected by it, we would— “chairperson: So then the word ‘primary’ is not necessary. Thank you, sir.” (Legislative testimony of Public Safety Comm, Mar. 4, 1988, at 61-62, lines 16-25, 1-8.)
Later still, the chairperson made the following remark:
“So — and they have suggested primarily served, and we don’t want the word primarily, as far as notice to the Council Members, Borough Presidents and Community Boards. So, at this point, the consensus of the Committee is not to include the word primarily, but to include all of these officials, Borough Presidents, et cetera, affected by it.” (Legislative testimony of Public Safety Comm, Mar. 4, 1988, at 5, lines 10-18 [second stenographer].)
4. The issue concerning injunctive relief.
As noted above, the conclusion that respondents had failed to comply with the notice requirements of section 487 (a) as to Engine Company 261 was stated in the interim decision and order entered on June 30, 2003 and the matter was set down for further argument as to the remedy appropriate in the circumstances. In due course each of the parties argued and submitted their positions in written form. Respondents conceded that the court “certainly has the authority to order the unit restored . . .,” but they urged that (a) the court has discretion to decline to do so, (b) that the failure to give the required notice was inadvertent, (c) that respondents had substantially complied with the notice requirement by sending out 29 notices, overlooking only two, (d) that the City would incur considerable expense if required to restore the unit for a 45-day period, and (e) that the merits of the closing had already been debated and that further debate on whether it should stay closed is “essentially moot” since the relevant City budget has been passed.
Petitioners urge that (1) section 487 (a) itself contemplates injunctive relief by tolling the period during which a notice is effective for any period during which a restraining order or injunction prohibiting a closing is in effect, (2) whether or not the failure was inadvertent and whether or not there was substantial compliance, the provision should be strictly *573 construed, (3) any expense incurred in reconstituting the unit was self-created when respondents disregarded a recommendation by the court to cure the defects before closing the unit, and (4) the debate concerning whether the relevant unit (and others) should remain closed is ongoing and far from mooted.
Concerning the application of the court’s discretion, it is true that there is no evidence of other than an inadvertent failure to give the required notice to the relevant parties and of substantial — if less than literal compliance — with section 487 (a). Indeed, it seems probable in the nature of the circumstances and the known facts that both entities promptly learned from other sources the information contained in the notices referring to the closing of Engine Company 261. It is also true that if compelled to reopen the firehouse, New York City will incur additional expense which would otherwise be avoided.
As noted by petitioners, however, the debate over the closing of Engine Company 261 and other units has not been mooted; efforts to accomplish the restoration of at least some are ongoing as frequent media reports attest. Further, any additional expense to the City which would be incurred by reopening the firehouse would be relatively small compared to the cost which would have been incurred had respondents followed the court’s recommendation on May 20, 2003. As petitioners also note, in determining the appropriate approach, the discouragement and deterrence of future violations — ones arising out of carelessness as well as wilfulness — should be taken into account.
Upon review, it is concluded that the balance is tipped in a very close question by two key factors: (1) the fact that the omission was inadvertent in the course of a good faith effort to comply with the law, and (2) the absence of any indication that the purpose of section 487 (a) was prejudicially affected in any way. (In that regard, it seems clear that the opportunity for— and the information needed for — protest and debate were available to, and acted upon, by the relevant parties.)
If there were indications of either an intentional violation or that the opportunity to protest and debate had been prejudiced as to the community board or the council member, the appropriate approach would be radically different. But in the circumstances presented, it is concluded that the injunctive power of the court should not be exercised and the status quo maintained.
In light of the above the applications are denied and the petition dismissed.

. After argument of this application, the plan was revised to exclude two of the houses scheduled for closing and to exclude the relocation of the additional unit.

. City Charter § 487 (a) provides, in pertinent part, as follows: “[T]he Commissioner shall provide written notice with supporting documentation at least forty-five days prior to the permanent closing of any firehouse or the permanent removal or relocation of any fire fighting unit to the council members, the community boards and borough presidents whose districts are served by such facility or unit.”